May it please the Court, my name is Jeff Schwartz and I represent the Kiowa Sioux Tribe of Tohon. In Jones v. Meehan, our Supreme Court expressly stated that Indians are wholly unfamiliar with all forms of legal expression and therefore, treaties must be construed as the Indians would have naturally understood them and not based upon their legal technical terms. In this case, the district court ruled that the Treaty of the Utahs did not grant any type of rights, land rights, to the Kiowa Sioux because it was not self-executing. Respectfully, I suggest that no one believes that the Kiowa Sioux Tribe naturally understood that the treaty needed to be self-executing in order for it to be valid. The district court also said that the Treaty of the Utahs did not designate, define, or assign limits to the Indians, but it did. It very expressly did. It said that the Indians bind themselves not to depart from their custom homes or localities without permission. That is a designation of land. That is your homes. That is what the Indians would have understood as their accustomed homes or localities. The Indians, like all of us, bury our dead near where we live, near our communities, and they consider those burial sites sacred. Were the Kiowa Sioux supposed to create portable burial sites so that they could move their ancestors around every time the U.S. moved them around? There was no suggestion of that, and they wouldn't reasonably expect that. The Indians were told, here's a treaty. We're going to stop fighting. You go over to your accustomed locales, and you stay there, and we're done fighting. That is what they understood, and that is what they did. And the district court's interpretation of the treaty specifically and totally legalistically is in derogation of the U.S. Supreme Court in Jones. I'm sorry. I lost my spot there. Well, while you're filing, could you just tell me? I'm a little lost. Which treaty are you talking about? I'm referring to the first of the treaties that were at issue, which was the Treaty of the Utahs. Okay. Thank you. Similarly, with the Treaty of the Treaty D, which the district court found did not grant any rights to the Indians because it wasn't ratified, there's no reasonable belief that the Indians understood that the agreement that they signed had to be ratified, what the ratification process was, who the Senate was, or what the implications were. They were left to understand that they signed an agreement and that that gave them certain rights. And any interpretation, as the district court did, that is completely limited to technical legal terms, again, is in derogation of the Supreme Court, and it is improper. The Indians were entitled to have an interpretation of all of these treaties as it would naturally as they would naturally understand that. Additionally, in Choate, another case referenced, the Supreme Court said that whenever there are doubtful expressions, they are to be resolved not in favor of the U.S., but in favor of the defenseless people, the wards of the nation. Additionally, with respect to Treaty D, as the Court is aware, the fact that it was not ratified was hidden from the Indians. Our government, in the form of our Senate, specifically ordered that no one be told that the treaty was not ratified. So where did you raise this estoppel argument before the district court? I did not handle that. I don't know if the estoppel argument was raised. Assuming for the sake of argument that it wasn't raised in the district court, why should we consider it for the first time on appeal? Because it is a legal argument, and there is some, as opposed to factual arguments, there is some leeway for legal arguments to be raised on appeal. Right. But here we're talking about estoppel, which is not a purely legal argument. I mean, the consideration of estoppel might be, but certainly there are factors that go into estoppel, including affirmative misrepresentation, reliance, and so forth. Those are factual matters. It's my understanding, and as I say, I was not counsel in the lower court, but it's my understanding that the factual issues, the fact that Treaty D, the non-ratification of Treaty D, was ordered by the Senate to be withheld, it's my belief that that was raised below, although the entire estoppel argument was not developed, as the Court said. But I believe that there's nothing factually new that I'm raising here. All right. So is it your position, then, that a government official can bind the United States to a treaty without it being confirmed, without it being ratified? In terms of the Indian position on it, yes. So if, for example, a government official from the Bureau of Indian Affairs signed a treaty granting the State of Montana to a tribe, that would not require Senate ratification? Would all the landowners be dispossessed? Is that your position? In terms of the Indian understanding of it, they would be entitled to that understanding. Now, there would have to be, obviously, some further legal proceedings to deal with that, but the Supreme Court has been clear that where the official government position – I'm sorry – where official government action has been taken, and we're not talking about something where, you know, some rogue went off and sold off Cleveland or something like that. We're talking about where there was an established treaty set up with – you know, under the auspices of the United States. There was no rogue agent off doing something he wasn't supposed to. But I certainly think that even beyond the Supreme Court statement that the Indians are to be treated as the way that they understood the agreement, the estoppel argument is extremely powerful, because in this case, we have an arm of the U.S. Government itself. This is not some rogue person. This is not as a defendant's – No, but there are cases in which, for example, the head of the Bureau of Indian Affairs has made a commitment, and later on, so you can't bind the government by estoppel, because you have to show affirmative misconduct, you have to show a whole bunch of other things. So the proposition that you're advocating, which is if an official of the government acts without authority, without authority, and they're bound by that, it's not necessarily true. I wasn't explaining it clearly enough. Let me – let me explain. We're talking about a treaty. We're not just talking about a statement. And the fact that the Indians had no way of – But doesn't that make it even more important that you have ratification if you're binding the United States to a land grant? No, because the Indians have no way of understanding this. That's what the – that's what Jones was all about. The treaty has to be interpreted as the Indians would reasonably understand it. And they had no understanding of ratification. They had no understanding of the Senate. Under the way that the Court is suggesting it, the U.S. could go out and do anything. No. What you can do is not do anything. You just have to – you don't have an agreement until you have an agreement that's binding on both parties. Then it needed to be made part of the understanding of the Indians. And it was never done. And the fact that it wasn't ratified was hidden. Whether we get to estoppel or not, there's no question that the U.S. So what's the best evidence that it was hidden? I'm sorry? What's your best evidence that it was hidden? It's in the record. It's in the congressional report. If the Court wants, I'll find it. But it's – it was in the congressional report. It's – would the Court like to use it? No, that's fine. I can use it. But it is – it's not just some allegation. There was – and I remember reading it. It's in the official Globe Gazette or whatever it was from the Congress that there was an injunction issued by the U.S. Senate that no one was to divulge what happened to this, and that was not – that injunction was not vacated for over 50 years. So we're talking about a situation where the Indians had no reasonable way to know that it needed to be ratified. I'm not at all saying that if the – if the understanding of the treaty is, Indians, here's what we're going to do, and this has to be ratified before it becomes effective. But there was no – there is no evidence that any of that was given to the Indians. And, as I said, again, going back to the Supreme Court in Chilt, wherever there's a doubtful expression where we don't know what the Indians knew, that must be resolved in favor of the wards of the United States. So unless we're going to go back and rewrite those – those rules, those are still the rules that we have to interpret these treaties on. Counsel, after Treaty D wasn't ratified, wasn't a process put in place to compensate folks who were damaged? There was a process put in place, but that does not undo the damage that was done. Well, the idea was, I think, to compensate folks for the damage, wasn't it? The defendants raised some issue about that. To be honest, I'm not sure what it was. There is no evidence that the Kiowa Sioux received anything or were part of any settlement or any further — That was going to be my next question, whether or not your client ever made any application, because I couldn't see that in the record. Is that — To the best – the only knowledge that I have, Your Honor, that this secondary process even occurred is a representation by the defendants. There is no record of it. There's nothing in the record that shows that it happened. So from an evidentiary standpoint, it's merely an argument made by the defendants. And I don't have any further information on it. Okay. Not to belabor the point, when you say it happened, no evidence that it happened, are you focusing on a process for compensating people? Yes. Or are you focusing on the lack of an application by your client? No. But the entire process of a compensation, there is no evidence anywhere in the record that I'm aware of that that entire process ever took place. All right. Thank you. So your position is that if the fact of the need for ratification were disclosed at the time, that that would be sufficient? Well, sure. Everybody understands. Okay. So here's what the treaty says. This treaty to be binding on all the contracting parties, to be binding on all contracting parties when ratified and confirmed by the President and the Senate of the United States of America. What's ambiguous about that? What's ambiguous about it is that as the Supreme Court has said, again, the only information that the Indians get is what is imparted to them by the translators. And they did not have an understanding of what that process is. The words were there. But that is a legal issue. And as the Court said, legal, the treaties are not to be interpreted against the Indians on legalistic and technical basis. And merely putting those words in there without any evidence that that information was conveyed and made part of the understanding of the Indians, we then have a doubtful expression which must be resolved in favor of the Indians. And I think their continued obedience to the treaty demonstrates that they believed that it had been ratified and the government preventing them from knowing it, which whether we go to estoppel or not, it is undisputed in the record that the government prevented the Indians from knowing this, that it hadn't been ratified, and the Indians continued to live their lives and do the things that they had agreed to do, certainly gives them a justifiable reliance. Had they been told this didn't get ratified, maybe there would be a different argument. I don't know. But we do know that for over 50 years they were not told that anything negative had happened with the treaty that they signed and that they lived their lives on and that they died on and that they buried their ancestors under, expecting that they – reasonably expecting that the land that they were told they were going to have was going to be theirs. And so – I'm sorry. I thought I heard a question. I apologize. Moving on, we have the issue of the ignored claim. The – Kyle Hsu raised the issue that some of the defendants' land grants were fraudulent, were forged. The district court never even addressed it. The district court relied on a case that said that – essentially that we don't revisit the law on settled land disputes. But that case said nothing about where there is an argument of fraud. And the – Kyle Hsu not only alleged fraud, but even before Twombly and Ickwill, they produced some evidence, some arguments. They talked about the fact that certain insignia were not in the right place, that certain insignia looked to be copied. There is no case that says that a district court has the right to simply decide it doesn't care about that issue. And the district court never – that's a factual issue. And the district court made a factual determination on a motion to dismiss, which is improper. Additionally, we have the allotments. The U.S. government has been allotting land to the Kyle Hsu tribe, and these allotments have gone from 1893 to 1963. And interestingly enough, most of these allotments expressly state they are for a U.S. The defendants take the complete technical view. In fact, reading from one of the briefs, I believe it's to Hone's, it says, although the superintendent of Indian Affairs for California established the Hone Sebastian Reserve on Tahone Ranch, the land was never formally set aside as a reservation by executive order. Well, that is doing exactly what Jones counsels us not to do, which is to rule on the technicalities rather than the natural understanding. And the final point that I want to address, and I'd like to reserve a couple of moments for rebuttal, is the error of law on the Rooker-Feldman. Rooker-Feldman is very clear. It has to be a State court loser trying to get a Federal court to overturn a decision that's already made in the State court. Yet here, it's very clear. First of all, the State court was completely on the plaintiff in the State court proceeding, had no connection whatsoever to the Kyle Hsu tribe. It wasn't them. They had no privity. And, more importantly, the State court ruling did not come out until 2012, and this case was initiated in 2009. So the trial court's or the district court's reliance on Rooker-Feldman was completely misplaced. I'd like to reserve my last two minutes or so for rebuttal. We'll give you the rest. Could you just answer one question I'm curious about? Certainly. How many members of the tribe are there now? Last, I think there's around 1,000 or so, but that's a rough guess. I mean, it's an ongoing, it's an ongoing vibrant tribe. This is not a Federally recognized tribe, right? It is not a Federally recognized tribe. Has there been any application to start that process administratively? The problem that they've had is that they were recognized, and then they were not. And the Bureau of Indian Affairs has no process to get re-recognized. They only have a process for getting recognized in the first place. So the status hasn't changed since the time of the briefing is what I'm asking. Is that right? That's correct, Your Honor. Sorry, my question wasn't a good question. Sorry. Thank you. May it please the Court. My name is Eric Miller, and I represent the Tohono Ranch Company and the related private appellees. I'm going to be sharing my time with Mr. Collins, who represents Kern County, and Ms. Roundtree, who represents Secretary Jewell. We've argued in our briefs that this Court lacks jurisdiction over the appeal because after the appeal was dismissed and the mandate issued. We recall the mandate, so we have jurisdiction. Well, I mean, it is our position that... Are you saying we can never recall the mandate? No. You certainly can recall the mandate. And we do it all the time. And our argument is that whatever the standard is that governs that, and we've relied on Calderon, but even if you accept for sake of argument appellant's position that it's the excusable neglect standard, the circumstances here do not satisfy that standard. And there's been a showing of neglect, but there's been no showing that it was excusable under the circumstances outlined in the brief. Unless the Court has further questions on that issue, though, I'll move on to the next point. The starting point for evaluating the title to the land at issue here is the 1851 Act, which established a procedure for determining title to lands in the territory that the United States acquired from Mexico in the Treaty of Guadalupe Hidalgo. Plaintiffs have alleged, and so it is agreed by everyone in this case, that the land at issue here is held by Tejon Ranch Corporation under a chain of title that traces back to four patents that were issued by the United States under that statute, and both the Supreme Court and this Court. Kagan. Forgive me, but it's just a little hard to understand. Again, it's the echo, but when you're talking about 1851 and you said that statute, there's a two-year period for folks to make claims, and am I right that you're telling me that the Tejon defendants made claims and their title traces back to those claims? The predecessors in interest made claims under that process, yes. And the – and your position is that opposing counsel's client did not? That's correct. All right. And that is – that is not just our position, that the complaint alleges that our title derives from patents issued through that process. So that process is the Act of 1851, if I'm hearing you correctly? Yes, Your Honor. Thank you. Forgive me, Judge Thomas. I interrupted you. No, no, no. I interrupted you. I think that's undisputed, isn't it? That's right. Yes, Your Honor. And both the Supreme Court and this Court have held that a patent issued under that statute cuts off any other claim of title, whether it's a private claimant, whether it's a tribe asserting aboriginal title, even if it's a State asserting a sovereign interest in the land. So what about this notion of Treaty D that was never ratified? Was there – was there a claim process set up to compensate people who were harmed by that? There was, Your Honor. And we have cited in our brief a decision of what was then the Court of Claims in Indians of California, XRL Webb against the United States in 1942 that considered those claims. I have that in my notes, but I'm just flipping looking for it now. Can you give me that cite real quickly? It's 98, Court of Claims 583. Thank you. And your position is that opposing counsel's client didn't make the claim? I believe that they did not. But whether they did or did not, you know, any claim that they would have – Yes. All right. And as the Court's questions have indicated, the Constitution is quite clear about the process for ratifying treaties. And a subordinate official of the government does not have the authority to bind the United States to a treaty unless it is ratified in the constitutionally prescribed manner, which was referred to in the treaty. And really, any claim resulting from the non-ratification of a treaty, if there is a claim, it would be against the United States, not against private landowners. The other treaty on which appellants rely is the treaty of – the treaty with the Utah. That treaty on its face does not grant title to any land. It doesn't even, you know, confirm a preexisting title to land. Quite to the contrary, Article VII says the government shall at its earliest convenience designate, settle, and adjust their territorial boundaries. So it contemplates some other process of determining territory. It doesn't of itself grant any territory. And in one of the Court of Federal Claims cases that we cite in our brief from Utah, that court construed the treaty the same way. My friend on the other side relies on the canon of construing treaties in favor of Indians, and we accept that. But that's a canon that governs the interpretation of ambiguities in treaties, and there's really no way that one can construe the language here to be a grant of title to any particular piece of property, certainly not to this one. Finally, there was a reference to an argument that the patents were obtained through fraud. That, I believe, may have been mentioned at one of the earlier iterations of the case that the district court allowed repeated amendments of the complaint. It is not been raised in the briefing before this Court. I don't believe it is in this complaint. And certainly, there's nothing in the complaint that would satisfy the Rule 9 standard of setting out with particularity the circumstances constituting fraud. Unless the Court has questions, I'll leave the remainder of my time to co-counsel. Thank you. Please, the Court. My name is Charles Collins. I'm a chief deputy at the current county counsel's office. I just have a few brief remarks. The county's involvement in this case was really just as related to the EIR and the various CEQA requirements of the Tohono Mountain Village development. In the last complaint, the third amended complaint, the only cause of action relating to the county was entitled equitable enforcement of the treaty. That cause of action was not raised in the opening brief in this case by the appellate. Appellate argues that really that was just a lack of the words equitable treatment or equitable enforcement of treaty. But I think any review of the opening brief would show that that cause of action was just never mentioned. Even if it had been abandoned, there really is no valid treaty to enforce or for the county to have dealt with in any way. And all this really leaves is the CEQA claim, which is a pendant state claim. Actually, the first one I've ever seen in a federal case. Maybe others exist. I don't know. But this was really dismissed by the district court after the second amended complaint and the order dismissing the second amended complaint. It was dismissed on three grounds in that one was a lack of subject matter jurisdiction because it wasn't related to any of the claims relating to ownership or possession of the property. One reason was that there was a lack of standing on the part of the Kauai Sioux tribe because they were not a federally recognized tribe. And those first two reasons that the district court dismissed that CEQA claim were also not dealt with in the opening brief in this case, and thereby the appellate abandoned those. Really, there's no reason even to reach the Rooker-Feldman argument in this case for your court, although it is, from my experience in looking at that Rooker-Feldman argument in CEQA cases, it did raise an interesting question, which is that if CEQA Petitioners start bringing their actions in both Federal and State courts simultaneously, they could obtain a lot of delay, if nothing else. And it would waste at least one court's time in each case. But that doesn't implicate Rooker-Feldman. Pardon me? That doesn't implicate Rooker-Feldman. No, no, Your Honor. It's more of a real-world concern. And if it does not ---- But they can bring a pendant claim as long as they establish Federal jurisdiction. Right, Your Honor. It's just a real-world worry of a person who has watched people use CEQA in many bad ways throughout my career. And with that, Your Honor, I have nothing else unless the Court has any questions. Thank you, counsel. Thank you. Good morning, Your Honors, and may it please the Court to marry around you on behalf of the Secretary of the Interior. As we explained in detail in our brief, the appellant's opening brief does not raise or present any arguments challenging the district court's rulings as to the claims against the Secretary. And notwithstanding the fact that we made that very point plainly and unequivocally in our answering brief, the appellant's reply brief is also silent as to the claims concerning the Secretary. And neither the opening brief nor the reply brief provide any explanation for the omissions. Therefore, the appellants have waived all of the issues they could have brought on appeal as to the Secretary. And we've explained that none of the exceptions to the waiver rule apply in this case. As to the newly raised issue, and it is a new issue of estoppel, as to the United States, that claim has also been waived because it wasn't raised or argued in the district court, and the district court didn't rule on it. But in any event, the new estoppel argument fails for at least three reasons, the first being that the United States is not a named party in this action. The only federally named defendant is the Secretary of the Interior. And even the two, even if the estoppel argument could be fairly read as against the Secretary, there's been no allegation by the appellants, as Judge Thomas pointed out, of any affirmative misconduct by the Secretary, and that's a requisite element of an estoppel claim. And third, in the appellant's own complaint, and as stated here before this Court, it was the United States Senate that was involved with either an injunction of secrecy, and the document that counsel was looking for is at the excerpts of record at page 69, it's a congressional record page, and refers generally without mentioning any treaties in particular, that there was an injunction of secrecy that had been lifted in 1905, but this again in no way implicates the Secretary. And just so I can make sure the Court is clear on this point, the estoppel argument as framed in the appellate brief is somewhat misleading or confusing at best. It is seems to be directed to the United States, though it goes to the claims concerning the appellant's alleged land rights. So at the end of the day, this estoppel argument doesn't matter for purposes of the Secretary, but I just wanted to make sure the Court understands the distinction, because it does seem to meld the two. Thank you, Your Honor. Unless the Court has any questions, we stand on a brief. Thank you. We'll give you three minutes. Thank you, Your Honor. A couple of quick things to address. With respect to the future discussed in the Treaty of the Utahs, it says that in the future there will be more distinct boundaries. So there are boundaries set now. They're your local customs. The second thing that I wanted to address is that the Kiowa Sioux were not required to submit their claims under the 1851 agreement, because their claims did not derive from the Mexican government. They derived from the Treaty of the Utahs in 1849. And no claims based on U.S. government treaties or otherwise claims to land were included in the 1851 requirement, which is the reason that they didn't need to make it. And secondarily, as we've said in the briefs, they did substantially comply, even if they didn't need to, by raising these issues with the U.S. government, who was their guardian in the treaty, the Treaty D, which was within two years of the 1851 requirement. Also, I wanted to bring out the as to the NAGPRA, there is no reservation required for a NAGPRA violation. So in other words, the Court threw out the Kiowa Sioux's NAGPRA claims based on the fact that they didn't have a reservation. But there's no reservation required. All there is to a under the definitions in NAGPRA, it has to be a recognized Indian, not an Indian tribe. But the Kiowa Sioux are recognized Indians, but their tribe isn't recognized. So they have full rights to bring a NAGPRA claim irrespective of whether they have a reservation or not. And so the Court erred in throwing out that claim based on the fact that it believed that they did not have a reservation. Also, I'm not even sure what the relevance is of the fact that people could bring CEA – CEQA claims in both State and court. That didn't happen in this case. The only one that my clients brought is in Federal court, and it was completely proper. But I would request that the Court vacate the dismissal and remand so that these issues that the Kiowa Sioux have raised specifically with respect to NAGPRA and their treaty rights can be decided on their merits. If the Court has any other questions, I'd be happy to answer them. Otherwise, I will leave. Thank you, counsel. Thank you. Thank you all very much. The case is arguably submitted. The Court will stand in recess for the day.
judges: Reinhardt, Thomas, Christen